Good morning, Mr. Yang. Yes, for the record, my name is Wei-Ming Yang. Here with me today is Mr. Philip Lau and Mr. Bruce Sin. Yes. We are representing ourselves today. Your Honor, this is the first in-person case for Hawaii. But this appeal presents certain important questions. And these are the intent of a public policy. The other is extortion loses hard bargain. Over the years, the JTB defendants have been sending their customers from Japan to visit this country on thousands every month. When these Japanese tourists come over here, they use the taxi service. All they have to do is get into a taxi, tell the driver where to go, and pay according to the tax meter. This kind of commerce relationship does not require any interference from any third party. However, because the key defendant in this case, the tourist company, for them, commission and kickback is one of their major source of revenue. When they see the tourists keep coming and they constantly use the taxi service, so they figure out this is a way they can make a commission out of this kind of commerce relationship. In 1997, JTB defendants and Charlie, they form a partnership to provide a kind of taxi service under the name of Oldie Oldie Taxi Service. Defendants, they knew that if just a taxi service, they would not play much of a role in this kind of situation. After all, their customer already knew how to use this kind of service. So in order to generate commission for them, defendants come up with a scheme. Now this scheme is based on three elements. One is the illegal pricing tactic. And second, control. And third, intimidation. I shall explain to the court how this scheme works. First, we look at the illegal pricing tactic implemented by the defendants. The difference between extortion and hard bargain is that extortion, as defined by the Hobbs Act, consists of the use of a wrongful means to achieve a wrongful objective. According to the case law, U.S. v. Comende, a person employs wrongful means within the meaning not only by employing means inherently illegal, but also by employing any of the means identified in the statutes, such as fear, threat. To obtain properties, the alleged extortionist has no lawful claims. Tax cabs are public vehicles here. The Honolulu Tax Ordinance is a public policy that intends for fair and non-discriminatory taxi service for the public. Since 1992, tax fare in Honolulu has been strictly regulated. This is the legal tax fare standard that applies to all passengers, disregarding race, nationality, color or skin, gender, etc. No discrimination allowed. In other words, all passengers should pay according to the tax meter rate. The meter rate is also a legal income standard to compensate taxi drivers. Anyone who violates this section of the Tax Ordinance could be subject to jail of one year or a $1,000 fine or both. Now we look at defendants' taxed ODOT taxi service. In order to attract JDP customers to use the ODOT taxi service so that generate more commission for them, the ODOT taxi service was not based on the meter rate. It was based on the fixed discount fare. The fixed discount fare is at least 10-15% below the meter rate. Not only that, this so-called fixed rate also includes any luggage charges and tips. When defendants promote this kind of ODOT taxi service to their customers, because of the substantial savings the customers will receive, so we do have more of this kind of call from the JDP customers. Do the regulations that govern taxis permit charging a lower fare than the meter fare? This has one exception. If I drive somebody, when we get to the destination, let's say the meter rate indicates $11, and the customer says, well, I'm sorry, I only get $10. As a driver, I have the discretion to say, OK, just give me $10. In that way, I will not violate the rule, because this situation happens very rare. Otherwise, all people should base on the meter rate. But because defendants fixed discount rate, yes, we have more JDP customers calling. These are basically tourists, either from Japan or from other states. So we call them foreign and interstate commerce. And on top of it, we have to pay defendants 20% commission. In other words, when a driver conducts a trip of ODOD1, he will at least lose 40% of the income. Therefore, while the ODOD1 provides the defendants more income, but the driver will be the one suffering. Defendants fixed discount rate is a violation of the tax ordinance because it causes discrimination against the local people and other non-JDP customers. And also, it deprives we, the plaintiffs, taxi drivers, a lawful income. Because defendants' pricing tactic was wrong, when the mean is wrong, the end also wrong. Therefore, the commission is an extortion. The second mean defendant tried to control the driver was this. In those days, Defendant Charlie Taxi was the biggest tax company here. It owns at least many good taxi stands. We, the driver, in order to make a living, so we pay them the highest monthly store rent to join the company so that we can go into those taxi stands to earn a living. Because of that, we basically either directly or indirectly controlled by the defendants as a group. After all, we were afraid to lose our job. Therefore, for a while, we go along with this kind of ODOD taxi service. Finally, defendants were using the fear tactic. Like taxi drivers, I tell them, we work long hours every day to make a living. These two, they do. We welcome any business opportunity if we can make a living out of it. So long as it's legal and acceptable. But the ODOD taxi service was an illegal scheme to enrich the defendants at the driver's cost. Defendants, they knew that they do not have the legal claim for the 20% commission. Because it was generated through an illegal mean, and that is because of the illegal pricing tactic they used to generate this 20% commission for them. In order to make sure the driver could provide the service and pay the money to them, they're using fear tactic and punishment to make sure drivers will comply. Any driver who refuses to charge the JTV customer based on a fixed discounted fare, or refuses to pay the 20% commission or the 15% interest penalty, the driver will be subject to penalty ranging from fines to dismissal. The fear for losing their job and other economic penalties, we, the plaintiffs and other drivers, for a while, we succumbed to defendants' unlawful conduct. In summary, we can see that defendants have violated the RICO Act based on these facts. Defendants acting with man's will, catch a scheme to obtain money from the plaintiff and other taxi drivers. Despite that, a kind of commerce relationship between the driver and the JTV customer do not require any interference. Defendant was in a dominant position. They have control over our business, either directly or indirectly. Because of the ODOD taxi service, we, the driver, basically were engaging in foreign and interstate commerce. Defendant's fixed discounted fare was a violation of the tax ordinance. Defendants have no legal claim for the 20% commission. So they used the interest penalty and other means to force the driver to comply with such service. Because of defendants' unlawful conduct, we, the plaintiffs, suffered losses in our taxi business. We also sustained other injuries. Therefore, we ask this court to reverse the district court's ruling, and that is the granting of defendants' blue-chalk motion, and demand the entire case for further proceedings. Thank you very much. Thank you, Your Honor. May it please the court. Ronald Heller for the Defendant Appellees. I think it's important to start out by noting that this entire case involves a contractual relationship. A contractual relationship between two independent business entities. Independent taxi drivers on the one hand, and Charlie's Taxi Company on the other hand. The parties were free to enter into or not enter into that agreement. The plaintiffs, in fact, admit that they wanted to be associated with Charlie's as Charlie's drivers because Charlie's had a good reputation, had good locations, and so forth. The plaintiffs, in fact, acknowledge that it is true that a driver could simply choose not to work for Charlie's, could drive as an independent or be affiliated with some other company. These plaintiffs chose to enter into contracts with Charlie's, and the essence of their complaint at this point is basically that Charlie's said, now that you've signed those contracts, you have to follow them. That's what it all boils down to. Well, it's curious to me why we didn't get the contracts until just now, if that's the essential part of this claim. Well, the plaintiffs had the burden of coming forward with a cause of action that the court could, first of all, understand, and second, find some basis for support in the record. What the court said in the context of a Rule 12 motion is that the plaintiffs had failed to state any viable cause of action and, therefore, granted our request. Well, they did. If you didn't have a written contract, you couldn't charge 15 percent for a light penalty. Well, that's one of two possible bases for the ruling of the court below, and we believe that either of the two would have been sufficient on its own. The other basis is that that 15 percent charge is not a finance charge as defined in Chapter 478 of the White House. Right, but you made the argument, and you make it on page 17 of your brief, Hawaii limits the interest rate that may be charged pursuant to written contract, all in respect to sex, et cetera, and it goes on to talk about written contracts. I mean, it was just astonishing to me, and you make an argument that the written contract allowed you to charge the rates and not provide the district court with the written contract. Even if you have the alternative basis for it, and your essential theory is that this is a contractual relationship, so to rely on them to say, as pro se plaintiffs, that to fault them for not providing the written contract is not their burden on the OB-6 motion. I understand and appreciate the court's concern. Our problem throughout this case has been trying to decipher what the plaintiff's position is at any given point in time. I think the record shows that the arguments that they're making have changed over time. In fact, some of the arguments that surfaced in the reply brief surfaced for the first time in the reply brief. And so we've had a difficult problem trying to figure out what their claim is in order to respond to it. But in any event- Why did you object to producing the contracts as burdensome? I mean, looking through the discovery request, they asked for a production of contracts. Apparently, they didn't have copies of the contracts, and you objected to the production of those contracts. Well, we did, in fact, ultimately produce the contracts of the plaintiffs. I think what they had asked for, or apparently were asking for, was the contracts of all Charlie's drivers, which is a very large group of people because there's a substantial amount of turnover among taxi drivers. And what they said is, give us all of your contracts with all of your drivers. And Charlie said, no, that's unreasonable. That's overly burdensome. But did, in fact, produce the contracts of the plaintiffs themselves. Going back to the court's question, we think that the district court had an ample and adequate basis for finding that there was no problem with the 15 percent charge simply by applying the definitions under the Truth in Lending Act, which clearly say that a charge for actual and unanticipated late payment is not part of a finance charge, is not interest for purposes of the Truth in Lending Act definitions. In fact, it's clear from the contract itself that this was not a situation where the plaintiffs were entitled to defer payment and then pay 15 percent extra. On the contrary, the contract expressly says in black and white that if you fail to make payment on time, that is a material breach for which the contract could be terminated. So it's not a charge for deferral. Furthermore, it's not based on how late the payment is. It's a flat 15 percent regardless of whether that payment is one day late or one week late or 10 years late. That's simply not interest. That's a late payment charge which is excluded from the definition of interest under the Truth in Lending Act. Now, going back to the basic question of the 20 percent commission, I think it's clear simply reading the Huntle Taxi Ordinance that nothing in there requires a taxi driver or a taxi company to charge the metered rate. The metered rate is effectively a maximum charge set by the ordinance, and the statute clearly says that it is not a violation to charge something less than the metered rate. Now, apparently the plaintiffs' position now, and again we get into new arguments surfacing in the library, their position now is that there's some kind of discrimination problem in charging a lower fare to one group of people than the drivers may be charging to other groups of people. We believe that there is case law saying that that is not a problem. For example, many companies offer senior citizen discounts. Many companies here in Hawaii offer kama haina discounts. Those kinds of things are very commonplace and have never been found to violate constitutional standards when engaged in by a private company. And there's no allegation here that this is some kind of state action, that somehow either the state or federal government is involved in setting different rates for one group than another group. This is simply a contractual arrangement where people who happen to be customers of JTB Travel can qualify for a discounted price in much the same way that other companies may say if you shop at XYZ Store, we'll give you a coupon that gives you 10% off at the restaurant next door. It's simply a private contractual type of arrangement. These are all, I guess, the clients of JTB Travel would be all people who were not Hawaiians, not residents of the state of Hawaii. It would be people who were visiting Hawaii. Basically, yes. I mean, I don't know that there's anything that would necessarily prevent a Hawaii resident from becoming a JTB customer, but as a practical matter, they are primarily visitors from Japan or from other places. It is an interesting theory, which, as you say, is raised a little late, but the idea of whether you can charge Hawaiians more than everybody else, but it's an interesting theory. I'd just like to briefly comment on the way the plaintiffs have used the term partnership and the way they have at times suggested some sort of employment relationship with Charlie's. I think we need to make it very clear that this is not an employer-employee relationship, nor is it a partnership. This is an independent contractual relationship between two parties contracting at arm's length. In fact, one of the other flaws in the plaintiff's theory of this case is that they have failed to identify the quote-unquote enterprise for RICO purposes. Their RICO case statement says that the enterprise is one and the same as the defendants, that is, Charlie's and JTB. That, as a matter of law, is clearly defective. You can't be both the person who has allegedly violated the RICO statute and the enterprise involved. They attempted, without any amendment to their pleadings, to overcome that argument by changing their description of their own case to say that their own independent taxi businesses are the quote-unquote enterprise involved. The reason I think that's significant is that if they did not have an independent business, something other than an employment status or a partnership status with Charlie's, then there clearly wouldn't be any enterprise for RICO purposes, and their claim would fail on that basis. So it's totally clear here that this is not an employment relationship. This is not a partnership. This is simply a contract. And if you parse through all of the claims they're making about the extortion and the instilling of fear and so forth, it all boils down to basically Charlie's saying, if you don't comply with the contract, we're going to enforce our contractual rights and terminate it. And bottom line, it is not extortion to say we're going to enforce our contractual rights. It simply is not extortion to say we're going to enforce our contractual rights. Of course, if there's no written contract, if you didn't know until this morning, it might be a different matter. Thank you. Practice plan. Yes, thank you. Do you want to have? Yes. Your Honor, defendant, they try to portray this as a contractual dispute case, but actually it's not. We, I mean these two plaintiffs, when they joined the company, they did sign some papers, but they never received a copy of what they signed. As a matter of fact, the so-called contract, we only got it last July. And when I showed it to Mr. Singh, he looked at the contract, the section regarding the ODOD service. He said, look, I never signed this paper. Somebody tampered my signature there. And that contract has 13 pages. When he signed, he had no idea how many pages actually in the contract. Plus six pages of attachment. So this contract, the so-called genuineness of those contracts is a question mark there. And Mr. Lau, I showed him the contract. Same thing happened. He joined the company in July 1996. Yes, he did sign the paper. But again, he never got a copy. So you have no idea what is this contract all about. In fact, they also said that the law does not require the customer to be charged with the middle way. And that's wrong. Yes, even though some companies, they set the middle way below the so-called standard way. But no matter what, the company still has to charge the customer based on the middle way. Even their middle way is lower than the standard way. And not only that, you have to charge all the customers based on this middle way and post the talent on the dashboard there. In other words, even though you're using a lower middle way, you still treat all the customers the same. The defendant further mentioned about enterprise. In this case, we are the plaintiff because we are self-employed. So our tax business is the enterprise. And defendants, the corporations, they're using a pattern of racket-feeling activity and collection of unlawful theft to exercise their control on us. And because of their wrongful conduct, so we suffer loss in our taxicab business. And also we suffer other injuries. Mr. Yang, in your case, you don't work directly for Charlie's, right? You work for Mr. Wang? No, I lease the company to Mr. Wang, yes. But you signed an agreement with Charlie's early on. Is that still in effect? Well, that was when I applied to join the company. They wanted me to sign a piece of paper. I can't understand it because I need a piece of paper to show to the tax commission somebody going to hire me as a taxi driver. Well, how does the commission work with you? I guess Mr. Wang passes it down to you in the way that you lease from him. Is that how all these fees get passed down to you? Oh, no. All the commission about the... I guess the question is, do you pay commission directly to Charlie's still? That's true. We pay commission to Charlie's every Monday. And I only pay Mr. Wang on the weekly so-called lease money to him. Thank you, counsel.
judges: Browning, Reinhardt, Thomas